IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FREDERICK J. CASISSA,                         No. C 09-4129 CW

      Plaintiff,

   v.

FIRST REPUBLIC BANK, a division
of MERRILL LYNCH BANK AND TRUST
FSB; and DOES 1-20,

      Defendants.

=================================/

ELIZABETH RIGGINS,                            No. C 09-4130 CW

      Plaintiff,                       ORDER GRANTING
                                              DEFENDANT'S MOTION
   v.                                      FOR SUMMARY
                                              JUDGMENT
FIRST REPUBLIC BANK, a division               (Docket No. 119)
of MERRILL LYNCH BANK AND TRUST
FSB; and DOES 1-20,

      Defendants.

=================================/

    Plaintiffs Frederick Casissa and Elizabeth Riggins bring claims against Defendant First Republic Bank concerning the termination of their employment. Defendant moves for summary judgment on Plaintiffs' claims. Plaintiffs oppose Defendant's motion. Having considered the papers filed by the parties and their arguments at the hearing, the Court GRANTS Defendant's motion.

BACKGROUND

    The following facts are construed in favor of Plaintiffs, as the non-moving parties.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plaintiffs were originally hired by First Republic Bank. Casissa Decl. ¶ 1; Riggins Decl. ¶ 1.  In September 2007, Merrill Lynch Bank & Trust Company, FSB acquired First Republic Bank. Ben-Ora Decl. in Supp. of Notice of Removal ¶ 1.  Following this acquisition, First Republic Bank continued to exist as an operating division within Merrill Lynch.  <u>Id.</u>  Bank of America, N.A., subsequently acquired Merrill Lynch in 2009, and is defending this case as successor-in-interest to Merrill Lynch.

Defendant employed Casissa as its Anti-Money Laundering (AML)/Bank Secrecy Act (BSA) Compliance Officer.  Casissa Decl. ¶ 1.  Until 2008, Casissa reported to Edward Dobranski, the General Counsel at First Republic Bank.  <u>Id.</u>  Casissa's duties included coordinating and managing the bank's compliance with the BSA.  <u>Id.</u>  Defendant employed Riggins as an Anti-Money Laundering Analyst, and she reported to Casissa.  <u>Id.</u>; Riggins Decl. ¶ 1. Riggins's duties included conducting investigations and preparing Suspicious Activity Reports (SARs), reports made by a financial institution to the Financial Crimes Enforcement Network (FinCEN), a bureau of the United States Department of the Treasury, "of any suspicious transaction relevant to a possible violation of law or regulation."  31 U.S.C. § 5318(g); 31 C.F.R. § 1020.320 (formerly 31 C.F.R. § 103.18).

In October 2007, Riggins received a copy of a news article related to suspected criminal activity involving a Ponzi scheme by two bank customers, Does One and Two.  Riggins Decl. ¶ 3; Casissa Decl. ¶ 5.  Riggins forwarded the article to Casissa.  Riggins Decl. ¶ 3, Ex. C; Casissa Decl. ¶ 5.  Casissa and Riggins then spoke to Dobranski about the article.  Casissa Depo. Tr. 16:9-10.

United States District Court
For the Northern District of California

The "substance" of what Casissa told Dobranski was that "there was negative news on the [customer] and that we should open up an investigation and file a SAR." Id. at 16:15-18.  Riggins and Casissa both told Dobranski that they believed that "[a] SAR was warranted."  Riggins Depo. Tr. 32:12.  Dobranski's response was that they should "take no action"[1] and "that we don't need to file a SAR because [the customer] had not been indicted, he hasn't been proven of any criminal activity, and that he stated it was just a credit issue."  Casissa Decl. ¶ 5; id. at 16: 21-24.  Casissa testifies that, in that conversation, "we didn't say specifically--I didn't say specifically" to Dobranski that they thought it would be a "violation of the law if we don't file" a SAR.  Casissa Depo. Tr. 125:16-18.  Casissa "made the assumption that [Dobranski] was aware that if we didn't file the SAR, then it's a violation of the law."  Id. at 125:5-7.  Riggins believed that Dobranski's "difference of opinion" from her and Casissa about filing a SAR constituted "impeding a law enforcement investigation" by "not finding it necessary to look at it further."  Riggins Depo. Tr. 30:3-18.  Riggins told Dobranski that she "was going to continue investigating" and that she "was refusing to dismiss this client's activity as reasonable and

_____

[1] Defendant objects to this statement in Casissa's declaration on the basis that it contradicts his deposition testimony.  Reply at 9.  Defendant cites a portion of Casissa's deposition testimony, in which he answered, "Correct," to the statement, "So the substance of Mr. Dobranski's reaction, as I understand your testimony, is he said he didn't think filing a SAR was necessary."  Casissa Depo. Tr. 18:23-19:01.  This is not contradictory.  Casissa did not testify that this was the entirety of Dobranski's response.  Accordingly, the Court OVERRULES Defendant's objection.

justified." Id. at 32:6, 32:18-24. She did not tell Dobranski
that she was refusing to engage in conduct contrary to the law and
regulations governing her duties and responsibilities at First
Republic. Id. at 30:23-31:13.

Casissa decided to raise the issue to Brian Walsh and Robert
Werner, higher-level employees of Merrill Lynch who were involved
in filing SARs and in anti-money laundering activity. Casissa
Decl. ¶ 6; Casissa Depo. Tr. 19:2-20:20. Riggins also
communicated with Walsh about the issue. Riggins Decl. ¶ 5.
Walsh expressed a belief that "additional research and an
investigation should be conducted as a result of the public
information and a potential SAR should be prepared." Casissa
Decl. ¶ 6; Riggins Decl. ¶ 5.

A meeting with Casissa, Dobranski, Werner and other personnel
from Merrill Lynch was subsequently held, at which Dobranski "was
adamant that the bank was not going to file the SAR." Casissa
Depo. Tr. 23:1-15. Casissa believes that the decision not to file
a SAR was reversed in a conversation between Werner and Dobranski,
but he did not participate in such a conversation. Casissa Depo.
Tr. 28:6:12. Casissa believes that the SAR was ultimately filed
in November 2007, within thirty days of the date that he became
aware of the news report. Id. at 54:16-23. Dobranski never
expressed any disapproval of Casissa or Riggins for raising the
issue with people at Merrill Lynch. Id. at 22:19-22; Riggins
Depo. Tr. 43:22-44:2.

In March 2008, Casissa and Riggins learned that a grand jury
subpoena related to another customer, Doe Three, had been served
on First Republic in August 2007. Casissa Decl. ¶ 7; Riggins

United States District Court
For the Northern District of California

1  Decl. ¶ 5.  First Republic began producing documents in response

2  to the subpoena when it was received in August 2007.  Smith Depo.

3  Tr. 50:11-51:06.  Casissa and Riggins had no responsibility or

4  role in complying with subpoenas.  Casissa Depo. Tr. 79:07-11,

5  136:19-137:3; Riggins Depo. Tr. 60:20-22.  In the normal course of

6  his job duties at First Republic, Casissa would have followed up

7  on a subpoena by opening an investigation; in this instance, Doe

8  Three was already under investigation by First Republic.  Id. at

9  78:2-17.  Casissa admits that he does not have any facts to

10  support a contention that Dobranski had deliberately concealed the

11  subpoena from him, other than that he was not told about it.  Id.

12  at 60:18-24.

13      Nonetheless, Casissa "was surprised and concerned that it had

14  not been brought to [his] attention before since it was part of

15  [his] responsibilities . . . to determine whether to report the

16  suspected criminal activity related to a subpoena."  Casissa Decl.

17  ¶ 7.  Casissa asked Dobranski about the subpoena, and Dobranski

18  told him "not to worry about" it and to take no action.  Id.;

19  Casissa Depo. Tr. 77:18-21.[2]  Casissa understood this to mean "not

20

21

22

23

24
_____

25      [2] At his deposition, Casissa was asked, "Is that when he said
    words to the effect as stated in paragraph 28 [of the Second
26  Amended Complaint (2AC)], not to worry about the subpoena?"
    Casissa responded, "Correct."  Casissa Depo. Tr. 77:18-20.  See
27  2AC ¶ 28 ("Dobranski instructed Casissa and Riggins 'not to worry'
    about the DOE 3 subpoena and to take no action with regard to the
28  DOE 3 subpoena.").  He did not testify whether or not Dobranski
    directly stated he should not do anything about the subpoena.

United States District Court
For the Northern District of California

1  to worry about it and don't do anything with it."  Casissa Depo.

2  Tr. 77:23-25.  Dobranski did not tell Casissa "anything about

3  whether [he] should or should not file a suspicious activity

4  report."  Id. at 87:9-12.  Nonetheless, Casissa believed

5  Dobranski's direction meant he should not file a SAR, because,

6  based on the subpoena and a "314 request"[3] they had received on

7  Doe Three, they "probably" had enough to file a SAR at that time.

8  Id. at 87:5-23.[4]

9       In the conversation, Casissa did not tell Dobranski that he

10  "refused to participate in conduct contrary to the law and

11  regulations governing their duties and responsibilities at the

12  bank."  Id. at 126:1-7.  He also did not mention to Dobranski that

13  he understood the instruction to require him to violate the law.

14  Id. at 126:8-13.  He assumed that Dobranski, as an attorney at a

15  bank, would understand the conversation to mean that Casissa was

16  opposed to breaking the law.  Id. at 126:14-18.

17       Riggins did not directly interact with Dobranski about the

18  subpoena.  Riggins Depo. Tr. 68:23-69:03.  She believed that she

19

20

21       In his declaration, Casissa states that, when he asked
    Dobranski about the subpoena, "He again informed me to take no
22  action."  Casissa Decl. ¶ 7.  Defendant objects to this statement
    in the declaration, arguing that it directly contradicts the
23  deposition testimony.  This is not contradictory, because Casissa
    did not testify that Dobranski said only "not to worry" about the
24  subpoena.  Thus, the Court OVERRULES this objection.

25       [3] The parties do not state what a 314 request is.

26       [4] Defendant states that Casissa admitted that a SAR was filed
    on Doe Three properly and timely, and cites pages of his
27  deposition transcript in support.  Mot. at 6-7 (citing Casissa
    Depo. Tr. 129:24-130:01).  Defendant failed to include these
28  deposition pages with its exhibits, but Plaintiffs have not
    disputed that a SAR was filed properly.

informed Dobranski through her actions that she was refusing to
follow his instruction to Casissa, because she continued her
investigation into Doe Three and included the subpoena in it.  Id.
at 73:24-74:12.  By doing so, she believes that she communicated
that she refused to participate in "withholding the knowledge of
that subpoena to Merrill Lynch and [Merrill Lynch's] office of
global compliance."  Id. at 74:13-15.

    About three days after his conversation with Dobranski about
the subpoena, Casissa asked Werner if he was aware of the
subpoena.  Casissa Depo. Tr. 133:14-134:4.  Casissa did not tell
Werner that he was refusing to violate the law, and did not tell
him that he believed Dobranski was trying to make him do so, but
assumed that Werner would understand him to mean that.  Id. at
128:16-24, 134:5-10.  Casissa told Werner that he was afraid of
the ramifications of going outside of First Republic to Merrill
Lynch and that he might lose his job.  Casissa Decl. ¶ 7.  Werner
told him that he and Riggins were protected.  Id. At some point,
Casissa also complained to Werner that Dobranski was hostile about
bringing First Republic's AML/BSA program into compliance with
Merrill Lynch standards.  Werner Depo. Tr. 46:18-47:6.

    On the same day, Riggins spoke about the subpoena with Werner
and Joane Herndon, from Merrill Lynch's Office of Global
Compliance.  Riggins Decl. ¶ 8.  She told Werner that she was not
going to follow Dobranski's instruction to Casissa not to worry
about the subpoena and that she "felt compelled to share the
existence of the subpoena with him."  Riggins Depo. Tr. 82:4-9.
She did not tell him that she believed that she was being asked to
engage in unlawful activity.  Id. at 82:12-16.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

After Casissa and Riggins brought the subpoena to the attention of Werner, he asked Dobranski to travel to New York to discuss the subpoena, because he was "extremely concerned . . . about the potential ramifications of not having known about it and having not coordinated on the anti-money laundering side," due to the "reporting obligations" that they "needed to evaluate." Werner Depo. Tr. 61:10-21. During Werner's investigation, he was uncertain as to what Dobranski knew or when he learned of the subpoena, and it appeared that Dobranski lied at some point about the date that he learned of it. Id. at 85:10-17, 86:19-87:6. Werner discussed with others his frustration that Dobranski was resistant to changing First Republic's procedures and his concerns that Dobranski was used to "flying under the regulatory radar" as a small bank and did not understand the "level of scrutiny" that staff at First Republic "were going to get under the kind of regulation that Merrill Lynch was subject to." Id. at 45:14-25. Dobranski admits that the legal department, including Casissa, at First Republic was remiss in not having a procedure in place by which there was communication regarding subpoenas between the individuals in charge of subpoenas and the AML group. Dobranski Depo. Tr. 97:17-98:14.

Plaintiffs contend that they were subsequently subjected to retaliation by Dobranski and others at First Republic for their insistence on complying with the BSA and reporting to Merrill Lynch.

In April 2008, a new position was created at First Republic, Senior Vice President of Risk Management, and Dave Montez, who previously served as the audit director of the Federal Savings

1  Bank for Merrill Lynch, was moved into the role.  Montez Depo. Tr.

2  18:12-16, 21:5-22:25.  Several different areas of risk management

3  were consolidated under this position, including AML/BSA, because

4  best practices suggested that the risk units should be brought

5  together.  Id. at 21:5-15.  Montez had experience with AML/BSA

6  only from an audit perspective, not from an operations

7  perspective.  Id. at 24:12-25.  After the restructuring and until

8  his termination, Casissa reported directly to Montez, and Montez

9  reported to Dobranski.  Id. at 34:5-13.  Montez was thus Riggins's

10 indirect supervisor.  Riggins Decl. ¶ 10.  Plaintiffs do not offer

11 evidence regarding who made the decision to put Montez into this

12 position, and instead state that this was "presumably" done by

13 Dobranski.  Opp. at 16.  They point out that Werner had the

14 "impression" that the decision was made by Dobranski.  Id. (citing

15 Werner Depo. Tr. 160:22-161:1).

16     Casissa believed that Montez was not qualified for the job,

17 because Montez did not seem to know basic AML terminology and

18 would ask Casissa questions about AML or BSA issues that others

19 asked of Montez.  Casissa Decl. ¶ 9.  Based on his interactions

20 with Montez, Werner also believed that Montez was not qualified

21 for the position and that "he had less AML experience and

22 understanding than [Casissa] did."  Werner Depo. Tr. 161:22-162:3.

23     Casissa's authority decreased after Montez became the Senior

24 Vice President of Risk Management.  Montez became the main point

25 of contact between First Republic and Merrill Lynch, and later

26 First Republic and Bank of America, for AML purposes and, as a

27 result, Casissa did not participate in various meetings on this

28 topic.  Casissa Decl. ¶ 9.  Casissa was not asked for input or to

United States District Court
For the Northern District of California

review Price Waterhouse Corporation (PWC) "engagement letters for work performed in the AML area," could not make changes or decisions without consulting Montez and could not file several SARs until he had Montez's approval.  Id.  Casissa does not provide evidence that he had participated in these meetings or engaged in these tasks before Montez was hired.  In or around February 2009, First Republic retained a consultant who began taking over Casissa's compliance responsibilities and who was eventually hired as the bank's compliance officer; Casissa was not told beforehand about the consultant or that his compliance responsibilities would be reduced.  Id.  Casissa also had difficulty getting additional staff, which he believed was necessary to conduct his work.  Id.  Casissa provides no evidence that he was able to get staff more easily before Montez was hired or that his workload increased after Montez was hired.

Riggins states that these changes also affected her. Specifically, she states that, because Casissa "no longer had access to information shared" at meetings, she did not get information necessary to perform her job effectively.  Riggins Decl. ¶ 13.  She also states that she was "not asked for input or requested to review" the PWC engagement letters and that she could not make changes or decisions without consulting Montez, although there is no evidence that she could do these things independently before he was hired.  Id.

After he became Casissa's manager, Montez observed, and was told by other employees, that Casissa was disrespectful in his dealings with coworkers and that he did not treat them as equals. Montez Depo. Tr. 35:13-36:14.  Montez felt Casissa acted this way

towards him.  Id.  Montez brought this up with Casissa during his performance reviews and in face-to-face conversations.  Id. at 36:15-21.  Montez also believed that Casissa lacked organizational and communication skills.  Id. at 37:6-38:12.  Montez received reports that Riggins was unorganized, disrespectful, did not communicate, and lacked process.  Id. at 52:8-53:3.

During his time at First Republic, Casissa was given either an outstanding or above average rating for all of his annual performance evaluations.  Casissa Decl. ¶ 3.  Except for one year involving budget cuts, he was also given an annual bonus, which averaged thirty to forty percent of his base salary and was based on performance.  Id.  Until Montez became his supervisor, all of his performance reviews were prepared by Dobranski.  Id.  In 2008, Montez prepared Casissa's last performance review, which rated him above average.  Id.  In the review, Montez noted at numerous points that Casissa needed to improve his communication skills and teamwork with staff in areas of risk management outside of AML, and cited problems with team management and organization.  Id., Ex. A.

While Riggins worked at First Republic, she received either an outstanding or exceeds expectations rating on all of her annual performance reviews, which were each prepared by Casissa.  Riggins Decl. ¶ 2.  In her last review, which covered the period through the end of 2008, her overall rating, on a scale of one to five, was "4++."  Id., Ex. A.  The review notes that she "has great interpersonal skills with both internal (i.e. Merrill Lynch and external . . . clients" and gives her a 4.5 rating for teamwork.

11

United States District Court
For the Northern District of California

Id.  This review was signed by Casissa and by Dave Montez, as the department head.   Id.

Casissa states that, prior to his termination, neither Montez nor Dobranski ever told him that his performance with respect to AML or the subpoena process was subpar, or that anyone at Merrill Lynch or Bank of America had concerns about his performance or that of Riggins.  Casissa Decl. ¶ 12.  He also states that he was never given a verbal or written warning about his performance. Id.

In early May 2009, Bill Fox, the head of the AML/BSA program for Bank of America, called Dobranski and told him that Casissa's duties would no longer include serving as the AML/BSA officer for First Republic.  Dobranski Depo. Tr. 62:22-64:5.  Dobranski asked Fox why, and recalls Fox saying that "we want an adult in that position."  Id. at 64:2-5.  Dobranski did not ask Fox what he meant by this, but assumed that it meant "that he was being terminated for performance issues."  Id. at 64:6-12.  According to a follow-up email, Fox also stated that Montez was to take on that role, and that Riggins was to report to an individual in the Bank of America AML program for the analysis and reporting of suspicious activity.  Id., Ex. 14.  Casissa testified that he had no reason to believe that Fox would want to retaliate against him for anything.  Casissa Depo. Tr. 164:22-25.

After Casissa was removed as the AML/BSA officer, Montez decided to terminate both Riggins and Casissa for "very similar" reasons, including "lack of organization, disrespectful, lack of communication, lack of process."  Montez Depo. Tr. 48:16-20, 52:3-10.  Montez had the option either to terminate Casissa and

Riggins outright or to include them in a reduction-in-force process that was occurring because of the Bank of America acquisition. Id. at 69:17-70:11. He included them in the reduction-in-force program to help them financially and get them additional benefits that they would not have received had they been otherwise terminated. Id.

Riggins and Casissa were informed of their terminations on May 29, 2009. Riggins Decl. ¶ 12; Casissa Decl. ¶ 10; Casissa Depo. Tr. 176:21-25. Each received a termination letter stating that his or her position was being eliminated as a part of the reorganization resulting from the combining of Bank of America and Merrill Lynch, and that the termination was effective as of July 31, 2009. Riggins Decl., Ex. B; Casissa Decl., Ex. B.

Plaintiffs bring claims under California law, asserting that Defendant violated California Labor Code section 1102.5(c) and terminated their employment in violation of public policy.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Federal Rule of Civil Procedure 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg,

United States District Court
For the Northern District of California

13

815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving

United States District Court
For the Northern District of California

14

1   party to produce "specific evidence, through affidavits or
2   admissible discovery material, to show that the dispute exists."
3   Bhan, 929 F.2d at 1409.

4        If the moving party discharges its burden by negating an
5   essential element of the non-moving party's claim or defense, it
6   must produce affirmative evidence of such negation.  Nissan, 210
7   F.3d at 1105.  If the moving party produces such evidence, the
8   burden then shifts to the non-moving party to produce specific
9   evidence to show that a dispute of material fact exists.  Id.

10       If the moving party does not meet its initial burden of
11  production by either method, the non-moving party is under no
12  obligation to offer any evidence in support of its opposition.
13  Id.  This is true even though the non-moving party bears the
14  ultimate burden of persuasion at trial.  Id. at 1107.

15                           DISCUSSION
16       Defendant moves for summary judgment on the ground that
17  Plaintiffs have not established a prima facie case for retaliation
18  under California Labor Code section 1102.5(c) and that they failed
19  to exhaust their administrative remedies for such a violation.
20  Defendant also argues that the non-disclosure and safe harbor
21  provisions of the Annunzio-Wylie Anti-Money Laundering Act and the
22  Bank Secrecy Act preempt California Labor Code section 1102.5 and
23  provide them with immunity from the charges brought here.
24  I.   California Labor Code section 1102.5(c)

25       Defendant argues that, because Plaintiffs did not file an
26  administrative claim with the California Labor Commissioner prior
27  to bringing this lawsuit, their section 1102.5(c) claim is barred
28  for failure to exhaust administrative remedies, pursuant to

United States District Court
For the Northern District of California

15

Campbell v. Regents of the Univ. of Cal., 35 Cal. 4th 311 (2005).
Plaintiffs respond that Campbell requires only exhaustion of
internal agency administrative remedies and does not apply to the
instant case.

This Court has held previously that the California Supreme
Court's holding in Campbell was not limited to the exhaustion of
internal agency administrative remedies.  See Hall v. Apartment
Inv. & Mgmt. Co., 2008 WL 5396361, at *3 (N.D. Cal.) (Wilken, J.);
see also Ferretti v. Pfizer Inc., 2012 U.S. Dist. LEXIS 27214, at
*12-13 (N.D. Cal.) (Koh, J.); Reynolds v. City & County of San
Francisco, 2011 U.S. Dist. LEXIS 117230, at *4 (N.D. Cal.)
(Seeborg, J.) ("post-Campbell, courts in this district have
uniformly held that claims under §1102.5 must first be presented
to the Labor Commissioner").

In Hall, this Court explained, "In Campbell, the California
Supreme Court discussed whether the well established rule in
California jurisprudence of exhaustion of administrative remedies
was abrogated in Labor Code § 1102.5."  Id. at *3 (citing
Campbell, 35 Cal. 4th at 321).  "The court held that 'the
legislative history appears unclear on the question of whether the
Legislature intended to depart from the exhaustion doctrine' and
concluded that 'we cannot read that intent into the statute when
the history does not clearly support it.'"  Id. (quoting Campbell,
35 Cal. 4th at 331).  "Thus, the court required Campbell to
exhaust her administrative remedies before bringing suit under
§ 1102.5."  Id. (citing Campbell, 35 Cal. 4th at 332).  "The court
did not limit its holding to require only the exhaustion of
internal administrative remedies."  Id.  While the court in

Campbell noted that there are certain exceptions to the exhaustion requirement, 35 Cal. 4th at 322, Plaintiffs have not argued, or offered evidence to support, that any of these exceptions apply here.  Therefore, Plaintiffs were required to exhaust available administrative remedies for this claim prior to filing the instant case.

California Labor Code section 98.7 provided Plaintiffs with an administrative remedy for their claims under section 1102.5(c).  See Ferretti, 2012 U.S. Dist. LEXIS 27214, at *12.  This section provides, "Any person who believes that he or she has been discharged or otherwise discriminated against in violation of any law under the jurisdiction of the Labor Commissioner may file a complaint with the division within six months after the occurrence of the violation."  California Labor Code § 98.7(a).  "The six-month period may be extended for good cause."  Id.

Plaintiffs do not dispute that they failed to file an administrative claim with the Labor Commissioner within six months after their termination or at any other time prior to bringing suit.  Thus, Plaintiffs' California Labor Code claims are barred for failure to exhaust administrative remedies.

The Court also finds that Plaintiffs have failed to establish a prima facie case under California Labor Code section 1102.5(c).  This section forbids an employer from taking retaliatory action against an employee for "refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."  In enacting the statute, the California Legislature intended "to protect employees who refuse to act at the direction

17

of their employer or refuse to participate in activities of an
employer that would result in a violation of law."  Act of Sep.
22, 2003, ch. 484, § 1, 2003 Cal. Legis. Serv. 484.

     To establish a prima facie case under section 1102.5,
Plaintiffs must offer proof that (1) they engaged in a protected
activity, (2) Defendant subjected them to adverse employment
actions and (3) there is a causal link between the two.  Mokler v.
County of Orange, 157 Cal. App. 4th 121, 138 (2007).

     If Plaintiffs establish a prima facie case, the burden then
shifts to Defendant to offer a legitimate, non-discriminatory
reason for the adverse employment action.  Id. at 140.  If
Defendant makes such a showing, the burden shifts back to
Plaintiffs to prove Defendant's proffered reasons for termination
are pretextual.  Id.  They may do this "either directly by
persuading the court that a discriminatory reason more likely
motivated the employer or indirectly by showing that the
employer's proffered explanation is unworthy of credence."  Id.
(internal quotation marks and formatting omitted).

     Plaintiffs have failed to raise a dispute of material fact
that they engaged in protected activity.  Plaintiffs have not
offered evidence that following Dobranski's directions not to do
anything in response to the news article or the subpoena would
have resulted in a violation of federal banking laws.  Federal
regulations require that every bank file "a report of any
suspicious transaction relevant to a possible violation of law or
regulation."  31 C.F.R. § 103.18(a)(1).  See also 12 C.F.R.
§ 353.3(a)(2) (requiring a report whenever "the bank detects any
known or suspected federal criminal violation, or pattern of

criminal violations . . . involving a transaction or transactions conducted through the bank, and involving or aggregating $5,000 or more in funds or other assets, where the bank believes it was . . . used to facilitate a criminal transaction, and the bank has a substantial basis for identifying a possible suspect or group of suspects"). The Federal Financial Institutions Examination Council (FFIEC)[5] states that the "decision to file a SAR is an inherently subjective judgment," and that "the bank should not be criticized for the failure to file a SAR unless the failure is significant or accompanied by evidence of bad faith." Fed. Fin. Institutions Examination Council, Bank Secrecy Act/Anti-Money Laundering Examination Manual 75-76 (2010),[6] available at http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf. See also id., Appendix R, R-6 ("The Agencies will cite a violation of the SAR regulations, and will take appropriate supervisory action, if the organization's failure to file a SAR (or SARs) evidences a systemic breakdown in its policies, procedures, or processes to identify and research suspicious activity, involves a pattern or practice of noncompliance with the filing requirement, or represents a significant or egregious situation.").

_____

[5] The FFIEC is an interagency body established by Congress and charged with "establish[ing] uniform principles and standards and report forms for the examination of financial institutions which shall be applied by the Federal financial institutions regulatory agencies." 12 U.S.C. § 3305(a).

[6] Defendant requests, and Plaintiffs do not oppose, that the Court take judicial notice of this document, which Plaintiffs cite in their 2AC. The Court grants Defendant's request.

In the first incident, involving Does One and Two, Plaintiffs cite a news article, which suggested that two of Defendant's customers were involved in an unlawful "Ponzi" scheme that may have implicated funds obtained through a loan held by Defendant. The evidence in the record supports that Plaintiffs and Dobranski had a different opinion as to whether, under the circumstances, a SAR was warranted. Plaintiffs offer no evidence establishing that Dobranski did not act in good faith, that failure to file a SAR would be significant or egregious, that such failure would represent a systemic breakdown in the bank's policies, procedures, or processes to identify and research suspicious activity, that there was a pattern or practice of noncompliance with the filing requirement, or that a SAR was required by law in this instance, based only on the news report.

In the second incident, involving Doe Three, Plaintiffs also offer no such evidence. The evidence does not establish that Plaintiffs ever proposed the filing of a SAR in relation to this incident with Dobranski. Dobranski's direction "not to worry about" the subpoena and to take no action on it appears related to the fact that someone other than Casissa and Riggins had the responsibility to collect and return documents in response to the subpoena, not that Casissa was to violate the law. This is supported by the fact that First Republic was already conducting an investigation into Doe Three. Plaintiffs acknowledge that they have no evidence that Dobranski deliberately kept the subpoena from them. Further, Casissa identified nothing that he would have done differently had Dobranski told him of the subpoena earlier or given him a different direction; the only action he normally would

take in response to a subpoena was to initiate an investigation and, in this instance, one was already ongoing.

Plaintiffs have also failed to raise a material factual dispute regarding a causal link between their purportedly protected activities and any adverse employment actions. To establish causation, Plaintiffs state that "defendant implemented a series of retaliatory acts soon after plaintiffs engaged in protected activities." Opp. at 18. They rely on temporal proximity to raise an inference of causation. Plaintiffs contend that the adverse employment actions began when Dobranski put Montez in place as Casissa's direct supervisor, to "engage[] in a plan to effect Montez as a buffer between him and plaintiffs," which culminated when Casissa and Riggins were terminated. Id. However, as previously noted, Plaintiffs offer no evidence that Dobranski decided to make Montez Casissa's supervisor. Several of the other purported adverse actions, such as Plaintiffs having to consult with Montez before making decisions or not participating in certain meetings, are the result of Montez's position as Casissa's supervisor, not a separate adverse action. Further, there is no evidence that Plaintiffs could do these things without supervision before Montez took that position. The remaining adverse actions--the retention of a consultant who took on Casissa's compliance responsibilities in February 2009, and the termination of Riggins and Casissa in May 2009--are too temporally distant from the purportedly protected actions in October 2007 and March 2008 to create an inference of retaliatory causation on their own. See, e.g., Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th Cir. 2003) (explaining that lapse of nine months defeated

United States District Court
For the Northern District of California

inference of retaliatory causation); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (stating that temporal proximity between protected activity and adverse action must be "very close" to support inference of causation).

Accordingly, the Court GRANTS Defendant's motion for summary judgment on Plaintiffs' first cause of action.

II. Wrongful Termination in Violation of Public Policy

Under California law, an employee may maintain a tort cause of action against his or her employer when the employer's discharge of the employee contravenes fundamental public policy. Foley v. Interactive Data Corp., 47 Cal. 3d 654, 666 (1988). Such claims are often referred to as Tameny claims, after the decision in Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 176-177 (1980). A claim for wrongful termination in violation of public policy must be based on a fundamental policy established by a constitutional, statutory or regulatory provision. Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 76, 90 (1998).

To the extent that Plaintiffs' Tameny causes of action rest on the fundamental policy established by section 1102.5(c), these claims fail for the same reasons that Plaintiffs have failed to establish a prima facie case for violations of this section.

At the hearing, Plaintiffs argued for the first time that their Tameny claims are based on the public policy set forth in the Bank Secrecy Act and not only on section 1102.5(c). However, Plaintiffs did not base this claim on any federal law in their complaint. See 2AC ¶ 42 (alleging that Defendant's conduct "constitutes the termination of plaintiff's employment in violation of the public policies, laws, and statutes of the State

of California and California Labor Code § 1102.5(c)").  The
Court's prior order denying Defendant's motion to dismiss the 2AC
also allowed the <u>Tameny</u> claims to proceed only "to the extent that
they implicate the same conduct that supports their claim under
1102.5(c)."  Docket No. 41, 8.  To allow Plaintiffs to add a new
basis for their <u>Tameny</u> claims at this late stage would unduly
prejudice Defendant, which has litigated this case with the
understanding that these claims were based on the alleged section
1102.5(c) violation.  Plaintiffs have offered no explanation for
their failure to allege this theory at any earlier point in this
litigation.

        Accordingly, the Court GRANTS Defendant's motion for summary
judgment on Plaintiffs' second cause of action.

CONCLUSION

        For the reasons set forth above, the Court GRANTS Defendant's
motion for summary judgment (Docket No. 119).  Because the Court
grants Defendant's motion in its entirety on other grounds, the
Court does not reach its argument that the non-disclosure and safe
harbor provisions of the Annunzio-Wylie Anti-Money Laundering Act
and the Bank Secrecy Act preempt California Labor Code section
1102.5 and provide it with immunity.

        The Clerk shall enter judgment and close the file.  Defendant
shall recover its costs from Plaintiffs.

        IT IS SO ORDERED.


Dated:  7/24/2012

                                    CLAUDIA WILKEN
                                    United States District Judge